Taliaferro, J.
The plaintiff had twelve' hundred dollars, which she was willing to put out at interest on mortgage security, and entered into an arrangement of the sort, as she supposed, with the defendant, Bourke, through the agency and advice of Van Solingen & Carpenter, brokers engaged in real estate business, the negotiation of mortgages, and matters of that kind. These brokers found that one William McC. Jones, a notary public, had a mortgage note, purporting to he signed by Bourke, the defendant, by making a cross mark' for twelve hundred dollars, which they were informed Bourke desired to have discounted, McC. Jones representing to them that the property proposed to be mortgaged was worth five thousand dollars and the title good, and the acts prepared to be passed before him. The plaintiff was informed of these facts, and advised by the brokers to make an investment of her money in the manner proposed, which she accordingly did, after going to see the property proposed to he mortgaged and on *386 further conference with the brokers and the title to the property being examined by an attorney. It turned out that the pretended note and mortgage were forgeries, gotten up by McC. Jones, the notary, who, some time after this operation, absconded with the money which he had pretendingly received for Bourke.
The plaintiff brought this suit against Bourke on the note she received, and, subsequently, in an amended petition, called Van Solingen & Carpenter in warranty. Judgment was rendered in favor of Bourke, but in favor of the plaintiff against Van Solingen & Carpenter, in sólido, for twelve hundred dollars, with interest, etc., and they prosecute this appeal.
A solution of this case depends mainly upon the conclusions to be drawn from the evidence, and that is conflicting. The plaintiff herself, her sister and father testify on her behalf, and the brokers in their own behalf.
The brokers say in their evidence that they knew nothing of their own knowledge of Bourke, whose note was to be discounted, nor of the property to be mortgaged, but derived their knowledge from McC. Jones, with whom they had frequent business transactions, and in whose integrity they had always implicitly confided. They both flatly deny that they ever told the plaintiff they were well acquainted with Bourke. The plaintiff is equally as positive in asserting that Carpenter was asked by her if he knew Bourke, and that he replied he did; that Bourke was a man of the highest reputation, a man he would trust with any amount of money. The plaintiff’s sister is equally positive in her statement that Van Solingen told her that he knew this man •Bourke Very well, but he said : “When you go to look at the house, you must not go in, because Mr. Bourke was a very proud man, and he did not want any person in the neighborhood to know he was borrowing money.” The plaintiff’s father is equally positive in his statement that he asked Carpenter if he knew Bourke, and that he answered he knew him perfectly, and that he knew the property.
If we attach credit to the statements of the plaintiff and those of her sister, we must infer that the brokers used persuasive means to induce the plaintiff to make the investment, and even a doubt might arise whether they did not take the initiative in the matter of making the investment. When placed upon the stand as a witness and being instructed by the attorney to tell all that transpired between herself and the brokers in regard to investing her money, the plaintiff said: “I was advised by them, who knew I had this money, to invest it — that it would be much better to put it out on a mortgage and to get interest. They advised me to do this in the capacity of friends, as they had known my family for years, as well as myself. I told Mr. Carpenter *387 that I did not wish to invest the money in anything, and I would rather keep it and get no interest. He then stated that it was not perfectly safe to keep money in that manner. I told him we had had so much trouble that I would rather keep my money; that I had worked hard for it. He said no, that there would be no trouble, and that he would see that all was perfectly safe; that he would ’see to it as if it was for his own daughter, and that it would be perfectly right. He told me to go and look at the property, as it was very seldom that one could find an opportunity to loan out so small an amount on good mortgages. He cautioned me before going to look at the property not to enter the house, because the gentleman who wished to borrow did not want it known that he was borrowing money, and that he was a very proud man; that we could look at the house from the outside and see that it was fully worth that amount of money.” * * * “ So we went the next day to Van Solingen & Carpenter to pay the money .for the note. I then noticed that the man, John Bourke, signed his name with a mark. I thought it very strange that a proud man, as he was represented to be, was not able to sign his name, and I said to Mr. Carpenter: ‘This man signs his name with a mark.’ He said yes. I said it is very strange, being such a proud man, that he should sign his name with a mark.” * ***** “ I would like to see the man who made that mark; there is nothing to prove that it is his mark. I said: ‘ Did you see him sign the mark V and Mr. Carpenter said yes. Then I said: Very well; if you saw him make the mark it is all right. I rely on your word. I believe you are a friend of mine, and if anything was wrong you would tell me. The money was then paid. Mr. Van Solingen also advised me to do it.”
The plaintiff’s sister testifies in this manner: “I had a property, and at the time there was a note coming due on it. Messrs. Van Solingen & Carpenter were the agents to procure more money on it. I let the property I had go; it was sold by the sheriff, and this Messrs. Van Solingen & Carpenter knew, and that we had the money. Mr. Van Solingen came up to the house, and he said to me: I have a splendid piece of property for you to invest your money in. It was much safer to invest it than to keep it idle, afid also to keep it in the house.” * * * “ When the note became due, I told her (the sister) it was time to renew the insurance. She went down to Van Solingen & Carpenter to see about it. The moment I went in, Mr. Van Solingen said: ‘I never liked that Mr. McC. Jones, and,’ he says, ‘ he was put in the Louisiana Retreat for drinking.’ ”***** “ When I went to Messrs. Van Solingen & Carpenter they acted very strange; they did not wish to interest themselves in the case at all.”
*388 Then there is the father’s testimony, corroborating in several important particulars the statements of the two daughters. He says that he dissuaded the plaintiff from making the investment; that he thought it a bad investment for a young lady to have anything to do with mortgages, and told her she had better not; but she held out that Mr. Carpenter had said this and that, and what great good we could do this man and Carpenter. The statement of this witness is that he went to the office of Yan Solingen & Carpenter for the purpose of asking a few business questions relative to the mortgage. The record shows that he made special inquiries of Carpenter as to the object and purport of the mortgage; whether he knew the party with whom they were to deal, and if he knew the property. He inquired of him if there was an abstract of the title; that after the thing was talked over, Carpenter said the deeds and everything were correct, and that he would attend to the insurance being made out in his daughter’s name. He then says he asked Carpenter if he was present and saw these deeds signed in the notary’s office, and he said he was. My daughter, he continues, had previously asked him as to the signature of Mr. Bourke being made with a cross or mark. Mr. Yan Solingen said that he was so well acquainted with the man that there was not the slightest or most remote danger. This witness, after much detail, says: “ The substance of the whole conversation was just simply this, that they vouched for the correctness and honesty, and uprightness of the mortgage; that they had known this man for years; that he was above reproach, and there would be no difficulty in getting the money when the mortgage fell due.”
Here then are three witnesses, two of whom have no direct interest in the case against two who have. In regard to the plaintiff we must bear in mind that she is a young woman obviously ignorant and unskilled in negotiations of the kind, evidently distrustful and hesitating, and at ñrst, unwilliug even, to make an investment, fearful of risking a loss of her money. That state of feeling and a disposition of that sort, it was- natural to expect in a female of her years, wholly inexperienced in making investments of money. All the particulars of the negotiations that occurred in making this instrument are detailed by the two sisters at considerable length, and the circumstances under which they were made are given with minuteness. This was to be expected. The lending out of $1200, all the plaintiff’s money, was to her a very important matter, and it is not to be wondered at that the circumstances attending the act created durable impressions upon her mind. More reliance, we should be inclined to think, might be placed on the memories of those two witnesses in regard to all that occurred during the transaction, than upon those of the brokers, who, *389 in the midst of other business, perhaps of much greater magnitude and.' importance, were not so exclusively absorbed in thinking of this single subject.
There is no good reason why the statements of these three witnesses,involving no contradictions, betraying no want of consistency, and-' being plain, simple and natural, should be disregarded, because they are so curtly contradicted by the brokers testifying in their own behalf.We must, from the evidence, regard the relations of these two defendants toward the plaintiff as being something more than those of brokers. Their functions and obligations did not cease upon merely bringing together the parties that were to contract and leaving them to arrange their business as they saw best. We must regard them in the light of mandatories, and as having assumed the character themselves, that they were bound to use the same diligence and precaution to prevent fraud being practiced upon the plaintiff that a prudent person would use in regard to his own affairs.
The evidence justifies the conclusion that they evinced an unusual desire that the investment should be made; that they were persistent in their recommendations to the plaintiff to invest her money, assuring her of the safety and advantage to her of the operation. They moreover assumed the responsibility of giving their personal attention to the transaction, and seeing that everything should be fully and correctly done to render it safe and beyond all hazard. Upon these assurances alone, and looking to them for their fulfillment, we are satisfied, the plaintiff was induced to lend her money. True, it is shown that they advised that the title should be examined, and were instrumental in employing an attorney to do it; but no examination or scrutiny was made of the note, the mortgage, the transfer of the policy of insurance, nor of the mortgage certificate, if there were one. Four forgeries were necessary in the transaction to carry it out — Bourke’s signature to the note, his signature to the mortgage, his signature to the transfer of the policy of insurance, and the recorder’s signature to the certificate of mortgage. The forged act of mortgage contains a clause reciting that “ according to the annexed certificate of the recorder of mortgages in and for the city and parish, dated this day, it will appear that said property is free of all incumbrance in the name of the mortgageor.” Now, the brokers knew that the money to be advanced by the plaintiff was to pay off a mortgage then existing, made by Bourke. It is clear-that a circumspect examination of these papers would have developed the fraud intended, and have saved the plaintiff from being made the victim of it. Yet, these defendants chose to rely implicitly upon the integrity of the notary, of whom, after the fraud became known, one of them said he “never thought much of this McC. Jones.” The purpose *390 of McC. Jones in having Bourke’s house and. premises examined without his knowledge or that of his tenants was sufficiently explained after the perpetration of the fraud. His solicitude that the equanimity of Bourke’s tenants should not be disturbed by persons interested in knowing the value of the property, instead of exciting suspicion in the minds of the brokers, was appreciated by one of them at least, for Yan Solingen, when interrogated as to whether or not he advised the plaintiff and her sister, when they went to look at the property, not to go inside of the house because Mr. Bourke was a very proud man and did not wish it known in the neighborhood that he was borrowing money, answered “that McC. Jones stated he did not wish the tenants disturbed any more than was necessary.” To the question: “ Did you tell them that 9” he answered : “ It is very' probable that I told them what Mr. Jones stated to me.”
We have attentively reviewed the evidence found in this suit, and think it sustains the judgment appealed from.
The case of Buddecke v. A. & A. Harris, 20 An. 563, presented on the part of the defendants as sustaining them, is not a parallel case with this one.
It is therefore ordered that the judgment of the district court be affirmed with costs.